EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN ROSARIO CRUZ, acusado y apelante.

Núm. 8402.—*Sometido:* Diciembre 17, 1940. *Resuelto:* Diciembre 23, 1940.

*R. Hernández Matos,* abogado del apelante; *Hon. Procurador General George A. Malcolm* y *R. A. Gómez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

Juan Rosario Cruz fué acusado de un delito de asesinato cometido en la persona de Natividad González, en el pueblo de Villalba del Distrito Judicial de Ponce. Convicto de asesinato en segundo grado y condenado a la pena de diez años de presidio, apeló de dicha sentencia, alegando como fundamentos de su recurso:

1. Que se cometió grave error al no absolverse al acusado por haber actuado en legítima defensa.

2. Que se cometió grave y perjudicial error al declararlo culpable de asesinato en segundo grado.

Ambos señalamientos se refieren a la suficiencia de la evidencia y a la apreciación de la misma por la corte inferior. Los consideraremos, pues, conjuntamente.

■■ De la evidencia aducida por el fiscal en apoyo de su teoría, aparece que el acusado era un peón que trabajaba en la Central Herminia, en Villalba, y el interfecto uno de los capataces a cargo de las brigadas de trabajadores; que el sábado 19 de junio de 1937, día de pago de jornales, el interfecto y el acusado tuvieron una discusión con motivo de haber insistido el acusado en que se le pagase a razón de sesenta centavos diarios, insistiendo por el contrario el interfecto en que lo convenido eran cincuenta centavos; que con ese motivo se cruzaron palabras ofensivas entre uno y otro; que el incidente terminó al intervenir el dueño de la central, pero el acusado se retiró molesto, provocando y desafiando al interfecto; que entre seis y siete de la mañana del lunes 21 de junio de 1937, el acusado esperó a González frente a la tienda de Martín Torres, sitio por donde aquél tenía necesariamente que pasar para atender a su trabajo; que al pasar González a caballo por aquel sitio, el acusado lo llamó, dejó en la tienda el machete que hasta ese momento había tenido en sus manos, se acercó a González, le dijo algunas palabras que motivaron el que González se apease del caballo y se agarraron a pelear los dos; y que en ese momento el acusado, sacando un puñal que llevaba escondido en el seno, le asestó a su adversario diez y nueve puñaladas que le ocasionaron la muerte instantánea. La prueba de cargo estableció además, que en el momento del encuentro González llevaba en el bolsillo trasero del pantalón el revólver que estaba autorizado a portar; que el acusado sabía que González acostumbraba andar armado; y que González no hizo

uso del revólver para defenderse de la agresión por parte del acusado.

El testigo José Semidey, condueño de la Central Herminia, relató así el incidente del día 19:

"¿Qué ocurrió ese día entre Natividad González y el acusado?

"Pues ese día, estando yo en mi oficina, que está contigua a la oficina de pago, oí yo una discusión entre el joven éste y el mayordomo; y entonces yo salí hacia afuera, y cuando yo llegué a la oficina de pago, el joven éste le decía que él le pagaba a los peones por amistad. Entonces él le dijo que le pagaba por el trabajo que prestaba cada uno, y entonces empezó una discusión, y entonces él le dijo que si quería ganar igual que los demás, que fuese el lunes y que si hacía el trabajo igual que los otros, le pagaría esa cantidad; y entonces éste le dijo que no iría el lunes a trabajar porque no trabajaba con pillos; y entonces él le dijo que era tan honrado como él o más que su familia. Entonces yo me paré y le dije que dejara esa discusión y siguiera el pago. Entonces este joven se salió para afuera y siguió hablando. Lo que habló no lo oí yo porque había una distancia . . ."

La prueba de la defensa tendió a sostener que fué el interfecto Natividad González quien después de negarle al acusado parte de su salario le apostrofó, le despidió del trabajo y le dijo "el lunes me la pagarás, el lunes te cobraré esto caro"; que el lunes por la mañana, al pasar Natividad González por frente a la tienda donde estaba el acusado, fué González el que llamó al acusado; que cuando el acusado se acercó al caballo de González, éste le agredió con la vara que portaba, se apeó del caballo y le atacó con los puños; que después de pelear a los puños durante cinco o seis minutos, Natividad González trató de sacar el revólver; que lucharon durante otros cinco minutos, Natividad tratando de sacar el revólver y el acusado impidiéndole que lo sacara; y, por último, que el acusado, al ver que su vida estaba en inminente peligro, sacó el puñal que portaba para sus faenas agrícolas y se defendió, evitando así que su adversario le matara.

El conflicto entre la teoría del Pueblo y la de la defensa es evidente. También lo es el que existe entre la evidencia

introducida por una y otra parte para sostener sus respectivas teorías. El jurado dirimió el conflicto dando crédito a la prueba de cargo y repudiando la teoría y la prueba de la defensa.

Hemos hecho un cuidadoso estudio de toda la prueba. Es la de cargo, creída por el jurado, ampliamente suficiente para establecer la concurrencia al acto delictivo que se imputó al acusado de todos los elementos esenciales para que dicho acto pueda ser calificado como asesinato en cualquiera de sus grados.

No creemos necesario discutir la jurisprudencia citada por el apelante, referente al derecho de defensa propia que la ley reconoce a todo ser humano. El jurado, facultado por la ley para dirimir como único juez los conflictos resultantes de la evidencia y para juzgar sobre la credibilidad de los testigos, llegó sin duda alguna a la conclusión de que el acusado había sido el que premeditadamente provocó la riña, con la intención de dar muerte en ella a su adversario. La prueba, examinada en conjunto, justifica esa conclusión. El que el acusado, después de llamar a su víctima y antes de acercarse a su caballo, dejase el machete en la tienda, hecho que la defensa interpreta como evidencia fehaciente de las intenciones pacíficas del acusado, seguramente y muy justificadamente a nuestro juicio fué interpretado por el jurado como prueba de la intención deliberada que tuvo el acusado de hacer creer a su víctima que el hombre con quien iba a encontrarse estaba desarmado, cuando en realidad llevaba en su seno el puñal con que habría de privarle de su vida pocos minutos más tarde.

No encontramos en el récord razón alguna que pueda justificar nuestra intervención para anular el veredicto del jurado o revocar la sentencia recurrida, *la cual debe ser confirmada.*